UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOSHUA MOORE,

        Plaintiff,

v.                                     Case No.  8:13-cv-1569-T-24 AEP

GEICO GENERAL INSURANCE
COMPANY,

        Defendant.

_____/

## **ORDER**

This cause comes before the Court on two motions: (1) Plaintiff's Motion for Partial Summary Judgment (Doc. No. 32), which Defendant opposes (Doc. No. 37); and (2) Defendant's Motion for Summary Judgment (Doc. No. 33), which Plaintiff opposes (Doc. No. 39).  As explained below, Defendant's motion is granted, and Plaintiff's motion is denied.

## **I.  Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted).  The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  See id. (citation omitted).  When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate

specific facts showing there is a genuine issue for trial.  See id. (citation omitted).

**II.  Background**[1]

Plaintiff Joshua Moore was an insured driver under his parents' automobile insurance policy issued by Defendant GEICO General Insurance Company ("GEICO").  The policy provided bodily injury ("BI") limits of $10,000 per person/$20,000 per occurrence, and property damage ("PD") limits of $10,000.

On May 11, 2010, Moore was involved in a multi-car accident.  (Doc. No. 33-4).  Moore was driving northbound on U.S. Highway 98 when another driver, Richard Waters, cut him off in traffic and the two drivers engaged in hand gestures.  (Doc. No. 33-4). Waters then swerved his truck into the side of Moore's truck, and Moore lost control of his truck, crossed into the southbound lanes, and hit Amy Krupp's vehicle nearly head on.[2]  (Doc. No. 33-4).  Krupp's vehicle was run off the road and rolled over in a ditch.  (Doc. No. 33-4).  Krupp and her minor son ("AO") were severely injured, and they were taken to two different hospitals.  (Doc. No. 33-4).  Moore was also injured and was hospitalized.

On May 12, 2010, Moore's mother, Lisa Moore, reported the accident to GEICO. GEICO began investigating the claim, and GEICO Claims Examiner Kecia Sirmans was assigned to handle the claim.

On May 17, 2010, GEICO sent letters to Moore and Mrs. Moore that informed them that GEICO's preliminary investigation revealed that the total claims from the accident may exceed

---

[1]There are cross-motions for summary judgment in this case.  However, the Court has recited the factual background in the light most favorable to Moore.

[2]Waters fled the scene, but when he was later apprehended, Waters admitted that he had been drinking and taking oxycodone prior to the crash.  (Doc. No. 33-4).

their coverage and that GEICO would make every effort to settle the claims within their coverage limit.  (Doc. No. 33-17, 33-18).  The letters also informed them that if GEICO could not settle the claims within their policy limits, they could be personally liable for the amount in excess of their policy limits.  (Doc. No. 33-17, 33-18).

On Wednesday, May 19, 2010, GEICO authorized the tender of the full $20,000 BI limit to Krupp and AO due to their extensive injuries and hospitalization.  (Doc. No. 33-14, p. 14-15).  Krupp and AO were represented by Lance Holden, Esq., and Sirmans called Holden's office on May 19th, 20th, and 21st and left messages for him to call back.    (Doc. No. 33-14, p. 12-13).  On Monday, May 24, 2010, Sirmans read in the newspaper that Krupp had died from her injuries on May 20, 2010.  (Doc. No. 33-14, p. 12).  On May 24, 2010, Sirmans instructed a GEICO field representative to go to Holden's office and tender the $20,000 BI limit checks.  (Doc. No. 33-14, p. 11).

On May 25, 2010, the field representative went to Holden's office to tender the checks, but Holden was not in the office and no one would accept the checks.  (Doc. No. 33-14, p. 10).  Later that day, Sirmans sent letters to Holden stating that GEICO's field representative attempted to tender the $20,000 BI limit checks, but no one would accept them. (Doc. No. 33-19, 33-20).  Therefore, Sirmans enclosed the checks along with releases in the letters.  (Doc. No. 33-19, 33-20).  The check for AO was made payable to AO's guardian and the hospital, because GEICO believed that the hospital may have been a lien hospital.  (Doc. No. 33-19, 39-1).

In response, on May 28, 2010, Holden sent a letter to Sirmans stating that he was rejecting GEICO's offer to settle Krupp's and AO's claims against Moore and his parents.  (Doc. No. 39-1).  Specifically, Holden stated, in relevant part:

3

I have now received two offers (with checks) from you and have shared them with my clients. They respectfully reject your offers. Despite your assertions, neither hospital is a lien hospital in that neither hospital had a statutory lien right. Therefore, we are returning the checks to you. Your paragraph #4 is unacceptable and any attempt to include such a paragraph on any release in response to our good faith offer will act as a rejection of the offer.[3] Nor do we agree with your payment conditions paragraph where the same requirements for acceptance to our offer applies.

* * *

There appears from your letters to be insufficient coverage by your insureds for both PD and bodily injury. However, because my clients want to get these matters behind them, my clients have reluctantly authorized me to offer to your insureds, in exchange for the payment of $10,000 in PD and $20,000 in BI coverage (assuming that there is only $10,000 available in applicable PD limits and $20,000 available in applicable BI limits and expressly assuming that there is no other applicable GEICO coverage) a release of all claims against your insureds. . . . In addition, my clients request an affidavit of each of your insureds or their respective insurance agents demonstrating that the only coverage that governs this claim is the coverage which you purport to cover this claim by virtue of your company's affidavit of insurance. If we receive all of the information set forth along with all applicable liability limits, my clients will sign a general release of any and all claims against your insureds [Moore and his parents]. My clients will not accept a release which contains a hold harmless nor indemnity agreement. However, my clients will pay all valid liens out of the proceeds of the settlement. My clients will not accept a release which . . . releases anybody other than your insureds . . . . Any attempt to provide a release which does so will act as a rejection of this good faith offer.

* * *

[I]n order to do my job properly, I must require strict compliance. . . . All of the above requested information and the tender of all applicable liability limits must be received by my law firm within the next twenty-one days.

(Doc. No. 39-1).  Thus, acceptance of Holden's settlement offer was due by Friday, June 18,

---

[3]While it is not clear from the letter, Holden stated in his deposition that his reference to paragraph #4 refers to the fourth paragraph *of Sirmans' letter* (as opposed to paragraph #4 of the release), in which she explains that she included the hospital on the check because GEICO believed that the hospital was a lien hospital.  (Doc. No. 33-23. depo. p. 34-35, 39-40).

4

2010.

On the same date, Holden sent a letter to Waters' insurance company offering to settle for his $10,000 PD limit (and noting that he was informed that there was no other available coverage). (Doc. No. 39-2). The letter requested the same information, release, and period for compliance as set forth in Holden's letter to GEICO. (Doc. No. 39-1, 39-2). Waters and his wife settled Krupp's and AO's claims against them by submitting an acceptable release and the $10,000 PD limits. (Doc. No. 39-4).

On June 4, 2010, Doreen Wilson, a GEICO supervisor, instructed Sirmans to forward Holden's demand letter and affidavits of no other insurance to Moore and his parents. (Doc. No. 33-14, p. 1). There is no evidence that Sirmans forwarded the demand letter to Moore and his parents. However, Sirmans did call and/or speak to Moore's mother, who was handling the Moore family's communications with GEICO, on June 7th, 9th, and 15th regarding the affidavits that needed to be completed. (Doc. No. 33-14, p. 1; Doc. No. 33-13, p. 10, 13, 15; Doc. No. 33-15, depo. p. 15-16).

On Monday, June 14, 2010, GEICO faxed a proposed release to Holden and asked him to advise if he wanted to make any changes. (Doc. No. 33-22). The release included two provisions that contradicted the demand letter. First, the release would release the following people: Moore and his parents, as well as "all officers, directors, agents or employees of the foregoing, their heirs, executors, administrators, agents, or assigns." (Doc. No. 33-22). This contradicted the demand letter's condition that Krupp and AO would only release claims against Moore and his parents.

Second, the release contained the following provision regarding payment: "The

5

undersigned agrees to execute and return this Release, and to execute and file with the Clerk of

the Court a Notice of Voluntary Dismissal, with prejudice, if a lawsuit has been filed, and that

payment shall not be due to the undersigned until twenty (20) days after this fully executed

Release has been delivered to GEICO." (Doc. No. 33-22). This language conflicted with the

demand requirement that payment be tendered by June 18, 2010.

The next day, on June 15, 2010, in response to Holden's demand letter, GEICO

overnighted a $30,000 check and the proposed releases. (Doc. No. 39-5, 33-24, 39-7). GEICO's

June 15, 2010 letter accompanying the releases and settlement check stated the following:

> Not all release forms precisely fit the facts and circumstances of
> every claim. Should you have any questions about any aspect of the
> release terms, please call me immediately. You may also send me any
> suggested changes, additions or deletions with a short explanation of
> the basis for any changes you suggest; or if you have a release that
> you desire to use, please forward it to me.
>
> We consider the enclosed proposed release a document which
> represents our settlement of this case on behalf of the insured
> party(s). We do not consider this release a document which creates
> any new terms or conditions governing our resolution of this claim.
>
> If you feel that there is any aspect of the enclosed document, which
> does not reflect our settlement of your claim(s), please contact me
> immediately so that we can see that the document is revised to reflect
> the exact terms of our agreement.
>
>              *     *     *
>
> Once, [sic] my insured completes the affidavit of no other insurance
> and I receive [it,] I will then forward it to you.

(Doc. No. 33-24).

On Tuesday, June 15, 2010, Sirmans faxed to Holden the affidavits of insurance executed

by Moore and his parents. (Doc. No. 33-13). It appears that GEICO sent Moore and his parents

form affidavits that did not fit their situation, and they attempted to hand-write in corrections,

which made the affidavits vague and confusing.  Specifically, the affidavit edited by Moore's

father provides the following (hand-written edits are in italics):

> I, Jimmy Dale Moore, state as follows:
>
> *I, Jimmy Moore, was not the driver on 5/11/10.*
>
> 1. The vehicle I *owned* at the time of the accident on 5/11/10 is owned by.  There are no other persons or entities that have an ownership interest in the vehicle.
>
> 2. The only policy of insurance covering the vehicle, _____ , I *owned* at the time of the accident, is policy number 4174792574, which is through GEICO General Insurance Company, and provides $10,000 per person/$20,000 per occurrence bodily injury coverage for this accident.
>
> 3. I am aware of no other insurance that provides coverage to _____ for the accident on 5/11/10.

(Doc. No. 39-6).  Likewise, the affidavit edited by Moore's mother provides the following

(hand-written edits are in italics):

> I, Lisa Hope Moore, state as follows:
>
> *I, Lisa Moore, was not the driver on 5/11/10.*
>
> 1. The vehicle I *owned* at the time of the accident on 5/11/10 is owned by.  There are no other persons or entities that have an ownership interest in the vehicle.
>
> 2. The only policy of insurance covering the vehicle, _____ , I *owned* at the time of the accident, is policy number 4174792574, which is through GEICO General Insurance Company, and provides $10,000 per person/$20,000 per occurrence bodily injury coverage for this accident.
>
> 3. I am aware of no other insurance that provides coverage to _____ for the accident on 5/11/10.

(Doc. No. 39-6).  Finally, the affidavit edited by Moore provides the following:

I, Joshua Moore, state as follows:

1.      The vehicle I was driving at the time of the accident on 5/11/10 is owned by. There are no other persons or entities that have an ownership interest in the vehicle.

2.      The only policy of insurance covering the vehicle, _____ , I was driving at the time of the accident, is policy number 4174792574, which is through GEICO General Insurance Company, and provides $10,000 per person/$20,000 per occurrence bodily injury coverage for this accident.

3.      I am aware of no other insurance that provides coverage to _____ for the accident on 5/11/10.

(Doc. No. 39-6).

Thus, the affidavits are conflicting regarding the ownership of the vehicle involved in the accident. Moore's parents' affidavits do not state that they own the vehicle *involved in the accident* at issue. Furthermore, with regard to the vehicle referenced in their affidavits, Moore's parents each state that they each, alone, own the vehicle and no one else has an ownership interest therein. While Moore clearly states that there is no other insurance covering the vehicle that he was driving that was involved in the accident, Moore's parents do not connect the vehicle that they refer to in their affidavits to the vehicle that was involved in the accident. As such, these affidavits do not strictly conform to Holden's condition requesting an affidavit from Moore and his parents demonstrating that the only coverage that governs this claim is GEICO's policy with a $20,000 BI limit and $10,000 PD limit.

On June 17, 2010 and twice on June 18, 2010, Sirmans called Holden's office to confirm receipt of the settlement documentation; however, she was advised that she needed to speak with Tammy, who was out of the office until Monday, June 21, 2010. (Doc. No. 33-13). On June 18, 2010, Holden faxed and mailed GEICO a letter rejecting GEICO's settlement attempt and stated:

8

This is to acknowledge receipt of the multiple documents and check you sent in response to our good faith offer of May 28, 2010.  For reasons which are not entirely clear, you, on behalf of your insureds, have elected to counteroffer rather than accept our good faith offer. Your release, in direct contradiction to our good faith demand, requires that we not only release your insureds (Lisa Hope Moore, Jimmy Dale Moore, and Joshua Moore) but also that we release GEICO (who is the agent of Lisa Hope Moore, Jimmy Dale Moore, and Joshua Moore) along with releasing various other persons and entities. Our good faith offer, as clearly written, indicated that any attempt to provide a release which released anybody or any entity other than your insureds would act as a rejection of our good faith offer. Your proposed release faxed to me along with your release sent to me unequivocally attempts to release not only your insureds but also release all officers, directors, agents, or employees of your insureds along with their heirs, executors, administrators, agents or assigns. The only obvious reason for this to be done would be to protect GEICO as the Moores' agent from any claims that might be brought against it. This was and is totally unacceptable and is a direct violation of the strict terms and conditions of our good faith offer. Your attempt to protect GEICO by sneaking GEICO in as a released party to our good faith offer was a clever but ineffective way for GEICO to put its own interests over its insureds. This is nothing more than tricky subterfuge. I sent your counteroffer to my clients for their consideration and they have respectfully declined to accept your counteroffer. They have instructed me to return to you the check for $30,000 which is now marked "void" for your file. My clients are understandably upset. They cannot understand why GEICO would take action in the manner in which they did.  My clients' offer was straight forward and easy to understand and follow.

In addition, your release requires that the money not be tendered until 20 days after you received signed releases back to GEICO. Although I recognize that you sent the money in advance, this clause of your release would have required my clients to sign a release first and then wait for the money. That, too, is unacceptable to them. Although you sent us affidavits, the affidavits that you sent make no sense. They do not clarify, as we requested, whether the driver and the owners of the car had any other coverage other than the coverage set forth in your affidavit of insurance. Instead, we have to make certain guesses and assumptions in trying to read your affidavits. I would like to explain to you what your affidavits say but the affidavits as written make no sense to me and they definitely don't specifically answer ownership and the possibility of other coverage.

9

> I have now been authorized to make you a new good faith offer for
> the property damage <u>only</u> for the same amount ($10,000) that you
> have already sent to us for the property damage portion of the claim.
> If you wish to accept this good faith offer for the property damage
> portion of the claim <u>only</u>, please tender a check . . . within 14 days
> from the date of this letter. My clients have instructed me to bring a
> claim for the full amount of the losses other than property damage.
> However, if you do not accept this offer, they will bring a claim for
> property damage as well. My clients will sign a release for the
> $10,000 only for property damage claims. All claims for bodily
> injury and wrongful death will not be affected by the release and this
> settlement and will remain in full force and effect. Any attempt to
> provide us with a release which requires us to sign a hold harmless
> or indemnity agreement, releases anyone other than your insureds, or
> releases anyone's claim other than our insureds will act as a rejection
> of this good faith offer as well.

(Doc. No. 39-7).

On June 24, 2010, Sirmans sent a letter to Moore informing him that their settlement attempt was unsuccessful.  (Doc. No. 33-28).  On June 25, 2010, Sirmans sent letters to Moore and Moore's parents that included a copy of Holden's June 18, 2010 demand to settle the property damage claim.  (Doc. No. 33-29, 33-30).  The letters also advised them that if GEICO could not settle the property damage claim within their policy limits, they could be personally liable for the amount in excess of their policy limit.  (Doc. No. 33-29, 33-30).

On June 30, 2010, GEICO sent a letter to Holden accepting the demand for settlement of the property damage claim for $10,000 and a release.  (Doc. No. 33-31).  This time, the release proposed by GEICO only released Moore and his parents and did not include language stating that the settlement payment would not be due until 20 days after GEICO received the executed release.  (Doc. No. 33-31).  Additionally, the letter included the following response to Holden's accusations regarding GEICO's failure to comply with his May 28, 2010 demand:

Your contention that GEICO was attempting to sneak itself into the release is simply not true. The proposed release submitted to you released only the insureds . . . and those persons through whom the insureds might be liable. You will recall that you offered to release the insureds from all claims. In no way was the proposed release we submitted to you [a] counter offer. Had you advised us that you found this language objectionable, we would have been happy to work with you to revise it. We are still willing to work with you to revise the release.

With respect to your other assertions that we have not complied with your demand, your June 18, 2010 letter clearly indicates you have recognize[d] that we "sent the money in advance". You go on to state you can not cash the check until the release is signed and we have received it which is clearly not the case. The release states "if a lawsuit has been filed, and that payment shall not be due to the undersigned until 20 days after this fully executed release has been delivered to GEICO". We are aware of no law suit being filed prior to your receipt of the check and releases. Moreover, this language appeared in the original release we sent [prior to the May 28, 2010 demand], and you raised no objection to the language in your letter of May 28. The verbiage, under the circumstances of this claim, is simply excess verbiage. But as you pointed out, you had the "money in advance".

We disagree with you[r] claim that the affidavits of our insureds are somehow confusing. First of all, we note that you did not send us a proposed affidavit for the use of our insured's individually. We sent you a copy of what we would propose to use to comply with your demand. We did not hear any objection to the affidavits. Signed affidavits from our insured's were submitted to you. They contained hand-written changes but are clearly legible.  Lisa and Jimmy Moore owned the vehicle involved in the loss, no one else had an ownership interest, and the only insurance covering the vehicle was the subject GEICO policy. Joshua Moore was the driver and [had] no additional insurance covering the vehicle. Additionally as stated previously a proposed copy of the affidavits were faxed to your office in attempt to make sure they conformed to your needs. We gave you the opportunity to make changes to these affidavits so that you could address whatever concerns you might have had with the language of the affidavits. However, neither you nor anyone from your office responded.

Based on all the above, we believe we did comply with the demands

11

in your May 28th letter. There was no intent to release anyone other then our insured(s) and GEICO is not listed on the release. We have met your demand and settlement had been reached. . . .

Even though our investigation to date has not revealed any liability against our insured, we are still willing to pay our insured's bodily injury coverage of $10,000 per person/$20,000 per accident. We have, in fact, acted in the Moores' best interest by tendering all available bodily injury limits, not once, but twice, and all available property damage limits as well. We once again extend to you and your clients our bodily injury liability limits for settlement of this claim. Please extend this offer to your clients.

(Doc. No. 33-31).

On July 9, 2010, in response to GEICO's June 30, 2010 letter, Holden sent a letter acknowledging the settlement of the property damage claim, reiterating that he would still be asserting bodily injury claims for Krupp and AO, and indicating that a lawsuit would be filed soon.  (Doc. No. 39-9).  On July 1, 2010, GEICO asked T.R. Unice, Esq. to represent Moore and his parents with respect to the upcoming lawsuit.  (Doc. No. 33-32).  On July 15, 2010, Sirmans sent Moore and his parents letters updating them on the status of the bodily injury claims and stating that if GEICO is unable to resolve the claims, a lawsuit could be filed against them. (Doc. No. 33-34, 33-35).  The letter informed them that GEICO would retain counsel to defend them and also warned them of the possibility that a judgment could be entered against them in excess of their policy limit.  (Doc. No. 33-34, 33-35).  Also on July 15, 2010, GEICO responded to Holden's July 9, 2010 letter, informing him that GEICO had retained Unice as counsel for Moore and his parents, and GEICO once again offered the full $20,000 BI limit to settle the bodily injury claims.  (Doc. No. 33-36).  Holden did not accept GEICO's offer to settle the bodily injury claims, and a lawsuit was filed against Moore and his parents on August 9, 2010.

At some point, Moore and his parents retained Kim Wells, Esq.  On October 9, 2012,

while the underlying lawsuit was pending, Wells sent a letter to Unice and Holden setting forth a

proposal.  (Doc. No. 39-10).  Specifically, Wells proposed that the underlying car accident

litigation be stayed and that the parties enter into a <u>Cunningham</u> agreement, which would allow a

bad faith claim against GEICO to be tried prior to the underlying car accident litigation being

tried.  (Doc. No. 39-10).  Further, he proposed that if GEICO won the bad faith litigation, the

bodily injury claims of Krupp and AO would be completely satisfied by the payment of the

$20,000 BI limit (which would protect Moore and his parents from the possibility of an excess

judgment).  (Doc. No. 39-10).  If GEICO lost the bad faith litigation, the underlying car accident

case would then go forward and GEICO would be liable for any judgment.  (Doc. No. 39-10).

Holden agreed to the proposal, but GEICO did not.  (Doc. No. 39-12, 39-14).

Thereafter, on January 18, 2013, Holden made an offer to settle the bodily injury claims

against Moore's parents for the $20,000 BI limit.  (Doc. No. 33-40).  Moore's parents accepted

the offer, and the claims remained against Moore only.

On January 24, 2013, Wells again proposed to stay the underlying car accident litigation

and enter into a <u>Cunningham</u> agreement to allow the bad faith claim to be litigated first.  (Doc.

No 39-15).  Wells proposed that if GEICO won the bad faith lawsuit, the claims on behalf of

Krupp and AO would no longer be pursued.  (Doc. No. 39-15).  Further, if GEICO lost the bad

faith lawsuit, the underlying car accident litigation would proceed and GEICO would pay the

judgment.  (Doc. No. 39-15).  Wells pointed out that this was an opportunity for GEICO to fully

protect Moore from a potential verdict against him for significant money damages.  (Doc. No.

39-15).  GEICO declined the proposal.  (Doc. No. 39-16).

The underlying car accident litigation went to trial, and on May 3, 2013, a judgment in

excess of $4 million was entered against Moore.  On June 14, 2013, Moore filed the instant bad faith lawsuit against GEICO.

GEICO and Moore have filed cross-motions for summary judgment.  The conduct of GEICO that Moore contends constitutes bad faith is the following: (1) GEICO's failure to advise Moore of Holden's May 28, 2010 offer to settle and the conditions for settlement; (2) GEICO's submission of a release that released more than simply Moore and his parents in response to the May 28th offer to settle; (3) GEICO's submission of a release that stated that GEICO's settlement payment was not due until 20 days after the release was executed in response to the May 28th offer to settle; (4) GEICO's submission of affidavits of insurance that were not tailored to the facts of the case in response to the May 28th offer to settle, which were rejected by Holden; and (5) GEICO's failure to enter into a <u>Cunningham</u> agreement that would have protected Moore.

### III.  Law Regarding Bad Faith Claims Handling

In <u>Berges v. Infinity Insurance Company</u>, the Florida Supreme Court explained the purpose of bad faith insurance law:

> Bad faith law was designed to protect insureds who have paid their premiums and who have fulfilled their contractual obligations by cooperating fully with the insurer in the resolution of claims.  The insurance contract requires that the insured surrender to the insurance company control over whether the claim is settled.  In exchange for this relinquishment of control over settlement and the conduct of the litigation, the insurer obligates itself to act in good faith in the investigation, handling, and settling of claims brought against the insured.  Indeed, this is what the insured expects when paying premiums. Bad faith jurisprudence merely holds insurers accountable for failing to fulfill their obligations . . . .

896 So. 2d 665, 682-83 (Fla. 2005).

14

Twenty-five years earlier, the Florida Supreme Court set forth the standard to be applied in bad faith litigation:

> An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business.  For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured.  This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same.  The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.  Because the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith.

Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783, 785 (Fla. 1980)(internal citations omitted).  Thus, "[a]n insurer cannot escape liability for breach of the duty of good faith by acting upon what it considers to be its interest alone."  Id. at 786.

In determining whether an insurer has acted in bad faith in handling a claim, the totality of the circumstances standard is applied.  See Berges, 896 So. 2d at 680 (citation omitted).  One court has provided the following general guidelines regarding bad faith:

> Bad faith may be inferred from a delay in settlement negotiations which is willful and without reasonable cause.  Where liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations.
>
> Any question about the possible outcome of a settlement effort

should be resolved in favor of the insured; the insurer has the burden to show not only that there was no realistic possibility of settlement within policy limits, but also that the insured was without the ability to contribute to whatever settlement figure that the parties could have reached.

\*      \*      \*

An insurer has a duty to advise the insured of settlement opportunities and the probable outcome of a lawsuit and to warn him of the consequences of an excess judgment so that he might take whatever steps are available for his own protection. Where the insured reasonably relies on the insurer to conduct settlement negotiations, and the insurer fails to disclose settlement overtures to the insured, the jury may find bad faith

Finally, the ultimate tender of the policy limits does not automatically insulate an insurer from liability for bad faith.

Powell v. Prudential Property & Cas. Ins. Co., 584 So. 2d 12, 14-15 (Fla. 3d DCA 1991)(internal citations omitted); see also Berges, 896 So. 2d at 680 (citation omitted).

"[T]he focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured. Berges, 896 So. 2d at 677. The insurer owes a fiduciary duty to act in the insured's best interests. See id. (citation omitted). While the issue of whether an insurer acted in bad faith is ordinarily a question for the jury, courts have, in certain circumstances, concluded as a matter of law that the insurance company did not act in bad faith. See id. at 680 (citation omitted).

**IV.  Moore's Motion for Partial Summary Judgment**

Moore moves for partial summary judgment, arguing that the Court should find that GEICO was obligated under Florida law, as part of its duty to communicate with its insured, to timely provide the Moores[4] with a copy of Holden's May 28, 2010 settlement offer letter. As

---

[4]Moore's parents settled the underlying claims for the policy limits and were not exposed to an excess judgment. As a result, the precise issue is whether GEICO properly communicated

explained below, the Court denies summary judgment on this issue.

The Florida Supreme Court has explained that the failure to inform an insured of a settlement opportunity can be *evidence* of bad faith:

> The duty to inform the insured of settlement opportunities is one of the duties subsumed within the duty of good faith owed by an insurer to an insured.  The failure to inform the insured of the settlement offer does not automatically establish bad faith; it is simply one factor for the jury to consider in determining whether the insurer acted in bad faith.

Berges, 896 So. 2d at 680 (citation omitted).  The Berges case does not dictate that partial summary judgment be granted for Moore.

The Berges case is clear about what it stands for—an insurer is expected to inform its insureds of *settlement opportunities* and that the failure to do so *should be considered* in the determination of whether the insurer acted in bad faith.  The case does not hold that the settlement offer letter itself must be forwarded to the insured; what matters is what the insurer communicated to the insured.  As such, the failure to forward the settlement offer letter does not provide a basis for partial summary judgment.  Accordingly, Moore's motion for partial summary judgment is denied.

## V.  GEICO's Motion for Summary Judgment

GEICO moves for summary judgment, arguing that it did not act in bad faith.  As previously stated, the conduct of GEICO that Moore contends constitutes bad faith is the following: (1) GEICO's failure to advise Moore of Holden's May 28, 2010 offer to settle and the conditions for settlement; (2) GEICO's submission of a release that released more than simply

---

with Moore.  The Court is cognizant, however, that Moore's mother was handling the communications with GEICO on behalf of her son.

Moore and his parents in response to the May 28th offer to settle; (3) GEICO's submission of a release that stated that GEICO's settlement payment was not due until 20 days after the release was executed in response to the May 28th offer to settle; (4) GEICO's submission of affidavits of insurance that were not tailored to the facts of the case in response to the May 28th offer to settle, which were rejected by Holden; and (5) GEICO's failure to enter into a Cunningham agreement that would have protected Moore.

At the outset, the Court concludes that GEICO's failure to enter into a Cunningham agreement that would have protected Moore does not constitute bad faith.  See Berges, 896 So. 2d at 671 n.1 (concluding that the insurance company's failure to accept a Cunningham agreement did not constitute bad faith).  Moore cites no authority for his proposition that GEICO's failure to enter into a Cunningham agreement can be considered when evaluating the totality of the circumstances for determining whether GEICO acted in bad faith. Furthermore, as explained more fully below, after considering the totality of the circumstances, no reasonable jury could conclude that GEICO acted in bad faith.

GEICO's conduct in this case can be described as sloppy, bordering on negligent.  There is no evidence that GEICO forwarded Holden's May 28, 2010 settlement demand letter to the Moores, GEICO's releases did not precisely conform to Holden's requirements, and the affidavits of no insurance were poorly drafted.  However, GEICO's conduct cannot be described as acting in bad faith, and it is bad faith conduct—not negligent conduct—upon which liability can be premised.  As recently stated by the Eleventh Circuit:

> To fulfill the duty of good faith, an insurer does not have to act perfectly, prudently, or even reasonably.  Rather, insurers must "refrain from acting solely on the basis of their own interests in settlement." . . . While evidence of carelessness may be relevant to

> proving bad faith, Florida has expressly stated that the "standard for
> determining liability in an excess judgment case is bad faith rather
> than negligence."

Novoa v. GEICO Indemnity Co., 542 Fed. Appx. 794, 796 (11th Cir. 2013)(citations omitted).

In this case, no reasonable jury could conclude that GEICO was acting solely on the basis of its

own interest.

While GEICO's conduct, as a whole, must be considered in determining bad faith, Moore

isolates GEICO's conduct in an effort to show bad faith.  However, when considered in context,

it is clear that at all times GEICO was attempting to settle the claims against Moore quickly and

completely.  The accident was reported to GEICO on May 12th and by May 19th GEICO had

authorized the tender of the full $20,000 BI limit.  GEICO tried to contact Holden for three days

(on May 19th, 20th, and 21st), and on May 25th, GEICO attempted to tender the $20,000 BI

limit checks along with proposed releases to Holden's office, before a demand was ever made.

On May 28, 2010, Holden made a formal demand that required acceptance within

twenty-one days (by Friday, June 18th).  At issue in this case is the language in the release and

the form of the affidavits of no insurance.  Despite the fact that GEICO had previously given

Holden proposed releases, Holden did not return the proposed releases with handwritten edits

regarding the language he wanted removed.  Instead, Holden responded with a somewhat

confusing letter describing what could and could not be included in the releases.  For example,

Holden objected to GEICO's "paragraph #4" and stated that it could not be included in the

releases.  As a result, GEICO removed the "paragraph #4" from the releases, when Holden

actually was referring to the discussion contained in the fourth paragraph of GEICO's May 25th

letter.  (Doc. No. 33-13, p. 11-14; Doc. NO. 33-23, depo. p. 34-35, 39-40).  Additionally, GEICO

faxed a proposed release to Holden on Monday, June 14th (prior to the June 18th deadline) and asked him to advise if he wanted to make any changes.

Rather than responding with proposed changes to the release, which was submitted prior to the June 18th deadline, Holden simply rejected GEICO's proposed acceptance on June 18th, when it was too late for GEICO to cure the alleged deficiencies.  Holden's rejection was based on his hyper-technical conformance requirement that placed form over substance.

Holden objected to the language in the releases that payment from GEICO would not be due until twenty days after the releases were executed and returned to GEICO.  Despite this language regarding when payment would be due, the $30,000 BI and PD payment was enclosed with the releases.  As such, this language within the release was of absolutely no consequence, and its inclusion, while sloppy, is not evidence of bad faith.

Holden also objected to the language in the releases that released Moore and his parents, as well as "all officers, directors, agents or employees of the foregoing, their heirs, executors, administrators, agents, or assigns."  (Doc. No. 33-22).  This contradicted the demand letter's condition that Krupp and AO would only release claims against Moore and his parents.  Holden explained that the inclusion of these other released people was materially adverse to his clients, because GEICO was attempting to sneak itself into the releases and have all claims against it be released.  This argument makes no sense.

Holden testified in his deposition that he was concerned from a malpractice standpoint that GEICO was trying to trick him.  (Doc. No. 33-23, depo. p. 80-81, 88).  Holden stated that he had experience with insurance companies claiming that the policy limits were a lower amount than what they actually were.  (Doc. No. 33-23, depo. p. 81, 88).  Holden's concern, however, is

undermined by the fact that when GEICO tendered the $30,000 and releases, GEICO provided

an affidavit from its Claims Manager that the policy that covered the truck had $10,000/$20,000

BI limits and $10,000 PD limits.  (Doc. No. 33-24, p. 4).  Thus, there were no claims that existed

against GEICO that Krupp and AO would be releasing by executing the releases, and as such,

the rejection of the releases on this basis was based on his hyper-technical conformance

requirement that placed form over substance.  Stated differently, Moore has not provided any

evidence that GEICO's inclusion of the offending language (mainly, the releasing of the Moores'

agents) was done because there were any claims that could have been asserted against GEICO

that it was trying to get released.  Without such a showing, it cannot be argued that GEICO's

inclusion of the offending language was done to put its interests ahead of Moore's interest.

Therefore, this conduct cannot be characterized as GEICO acting in bad faith.

Furthermore, had the claimants truly wanted to settle their claims for the policy limits but

for the alleged deficiencies in the releases, Holden could have simply picked up the phone and

addressed the deficiencies with GEICO.  As previously stated, GEICO faxed the releases to

Holden on Monday, June 14th (prior to the Friday, June 18th deadline) and asked if the releases

were acceptable.  Instead of communicating with GEICO prior to the deadline to address the

alleged deficiencies, Holden rejected GEICO's settlement attempt and then proposed to settle the

property damage claim only.

Another alleged component of the rejection of GEICO's settlement attempt is the fact

that GEICO provided affidavits of no insurance that were poorly drafted.  On Tuesday, June

15th, GEICO faxed Holden the affidavits of no insurance.  Again, Holden did not communicate

to GEICO that he found the affidavits to be unacceptable.  Had Holden simply picked up the

phone, GEICO could have corrected its mistake and provided better affidavits prior to the June 18th demand deadline.

Thus, the rejection of GEICO's settlement attempt appears to be based more on the creation of a bad faith claim against GEICO than on truly attempting to settle the claimants' claims.  The releases and affidavits of no insurance, while sloppy, could have been corrected prior to the demand deadline had Holden simply picked up the phone.  Failure of Holden to do so, when GEICO was so clearly attempting to settle these claims and to do so within Holden's time-line, shows that there was not a realistic possibility of settlement and GEICO's alleged errors were not the real reason that the claims against Moore did not settle.

Finally, Moore contends that GEICO's failure to advise him of the specific conditions within Holden's May 28th demand letter offering to settle is evidence of GEICO's bad faith. This Court acknowledges that the failure to inform an insured of a settlement opportunity can be evidence of bad faith, but that failure alone does not automatically establish bad faith.  Instead, the failure to inform an insured of a settlement opportunity is simply one factor for the jury to consider in determining whether the insurer acted in bad faith.

No jury could conclude that GEICO's failure to advise Moore of the specifics conditions within Holden's May 28th demand letter is evidence of bad faith, as the failure to disclose such information could not be said to have been done in order to look out for GEICO's interests above Moore's interests.  This is not a situation in which GEICO failed to communicate a settlement offer because it simply did not want to pay out to settle the claim.  Instead, the facts show that at all times GEICO was trying to settle the claims and to comply with the conditions of the settlement demand.  While GEICO's failure to forward the May 28th demand letter to the

22

Moores could be described as sloppy claims handling, such conduct does not rise to the level of bad faith.

The Court notes that Moore's mother contends that had she known about the specifics of the May 28th demand, she would have gone to GEICO's office and sat with a supervisor, hired a lawyer, and/or done a whole lot more than she did.  (Doc. No. 33-15, depo. p. 80).  However, there is no reason to believe that she could have made a difference and effectuated a settlement. This Court is cognizant that to the extent that an insurer argues that its failure to communicate a settlement offer to its insured did not result in an excess judgment because there was no realistic possibility of settlement, "[a]ny question about the possible outcome of a settlement effort should be resolved in favor of the insured."  Powell v. Prudential Property & Cas. Ins. Co., 584 So. 2d 12, 14 (Fla. 3d DCA 1991).  However, based on the rejection of GEICO's settlement attempts, there is no reason to believe that a realistic possibility of settlement actually existed.[5] Accordingly, the Court concludes that GEICO is entitled to summary judgment.

This is a tragic case for the underlying claimants.  While money cannot remedy the situation, it adds insult to injury that the underlying tortfeasors did not have sufficient bodily injury insurance coverage.  However, the underlying tortfeasors are to blame for the inadequate insurance, not GEICO, and the Court refuses to turn GEICO's limited insurance policy into an available deep pocket to pay the bodily injury claims.

---

[5]To the extent that Moore argues that evidence of a realistic possibility of settlement exists because the claimants settled with Waters for his $10,000 PD limit despite the fact that he had clear and substantial liability for the claimants' injuries, the Court rejects this argument.  The bodily injuries to Krupp and AO supported significant damages; the property damage claim was never alleged to be greater than the combination of Waters' and Moore's policy limits.  Since Waters did not have bodily injury coverage, a bad faith claim could not be asserted against Waters' insurance company for the claimants' bodily injuries.

Justice Wells of the Florida Supreme Court identified the problem that exists in bad faith litigation in a thorough and well-reasoned dissenting opinion:

> I recognize that since this Court's decision in [Boston Old Colony], bad faith claims against liability insurers have served a useful role in the regulation of Florida's insurers. I know that there are real incidents of bad faith conduct on the part of insurers in the handling of insurance claims, which are deservedly a basis for bad faith damages. In other words, there is a place for a remedy against insurers that in real situations act in actual bad faith.
>
> On the other hand, I must also recognize that there are strategies which have developed in the pursuit of insurance claims which are employed to create bad faith claims against insurers when, after an objective, advised view of the insurer's claims handling, bad faith did not occur. This is a strategy which consists of setting artificial deadlines for claims payments and the withdrawal of settlement offers when the artificial deadline is not met. The goal of this strategy is to convert a policy purchased by the insured which has low limits of insurance into unlimited insurance coverage.
>
>         *      *      *
>
> [Allowing created] bad faith action[s] is . . . greatly detrimental to Florida's liability insurance consumers because of the increases in their insurance costs.
>
>         *      *      *
>
> My conclusion is that while bad faith claims based upon substantive wrongful acts by an insurer are a useful part of insurance regulation, such claims must be carefully screened by the courts so that only real–rather than created–bad faith claims provide a basis for a bad faith recovery of damages against an insurer.
>
>         *      *      *
>
> I do not believe that it is acceptable for the Court to merely say that bad faith is a jury question. It is the Court's responsibility to have logical, objective standards for bad faith and not to avoid setting definitive standards by declaring bad faith to be a jury question. The Court should recognize that it has the responsibility to reserve bad faith damages, which is limitless, court-created insurance, to egregious circumstances of delay and bad faith acts. The Court likewise has a responsibility to not allow contrived bad faith claims that are the product of sophisticated legal strategies and not the product of actual bad faith.

Berges, 896 So. 2d at 685-86 (citation omitted).

## VI.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1)     Plaintiff's Motion for Partial Summary Judgment (Doc. No. 32) is **DENIED.**

(2)     Defendant's Motion for Summary Judgment (Doc. No. 33) is **GRANTED**.

(3)     The Clerk is directed to enter judgment in favor of Defendant, terminate all pending motions, and to **CLOSE** this case.

**DONE AND ORDERED** at Tampa, Florida, this 30th day of June, 2014.

*Susan C. Bucklew*
SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record